Floyd Abrams (FA-0902)
Susan Buckley (SB-4668)
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
THE NEW YORK TIMES COMPANY,                   :
                                              :
                          Plaintiff,          :     Case No. 04 CV 07677 (RWS)
                                              :     (FM) (ECF case)
                                              :
              - against -                     :     **COMPLAINT FOR**
                                              :     **DECLARATORY AND**
JOHN ASHCROFT, in his official capacity       :     **INJUNCTIVE RELIEF**
as Attorney General of the United States, and :
THE UNITED STATES OF AMERICA,                 :
                                              :
                                              :
                          Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff, The New York Times Company ("The Times") through its under-

signed counsel, herein alleges:

1.      Upon information and belief, the United States of America, by actions

about to be taken by the Department of Justice ("DOJ"), is on the verge of obtaining tele-

phone records reflecting confidential communications between two Times journalists, Philip

Shenon and Judith Miller, and their confidential sources. This will occur, if current plans of

the DOJ are permitted to proceed, as part of a "leak" investigation that seeks to identify gov-

ernment employees who may have provided information to The Times. The DOJ intends to

seek these records not from The Times, which could respond by moving to quash any sub-poenas served, but from third-party telephone companies that, notwithstanding remonstrations by The Times, have indicated that they will not resist the requests. The DOJ has informed The Times that it intends to obtain the records "in short order" (if it has not already done so), and without notice to The Times. The DOJ has rejected requests to provide any details to The Times or the journalists about when, where and how it will seek the documents (if it has not already done so), or what other steps, if any, it has taken that might obviate the need to seek these records at all.

2.      The DOJ has advised The Times that it intends to obtain records of all telephone calls by Mr. Shenon and Ms. Miller for 20 days in the weeks and months immedi-ately following the attacks on the United States of September 11, 2001 — a time when both journalists were covering and investigating a vast array of sensitive and controversial issues.

3.      Mr. Shenon and Ms. Miller are experienced, award-winning journalists, each of whom has reported for The Times for more than twenty-five years. Mr. Shenon has extensive experience reporting on the Middle East and was one of two Times reporters sent into combat with American troops during the 1991 Persian Gulf War. Since the fall of 2001, Mr. Shenon has focused his reporting on issues concerning homeland security, terrorism and the work of the 9/11 Commission. Ms. Miller has reported extensively for The Times on na-tional security issues, with special emphasis on terrorism, the Middle East and weapons of mass destruction. Ms. Miller has also written four books, including books covering Saddam

Hussein and the spread of Islamic extremism.  Ms. Miller shared a Pulitzer Prize for her January 2001 series on Osama bin Laden and Al Qaeda.

4.     Given the scope and breadth of the DOJ's demand for telephone records and the scope and breadth of Mr. Shenon's and Ms. Miller's reporting in the fall of 2001, the records sought would likely reveal the identities of not one or two, but dozens of confidential sources who provided a vast array of information for articles about, among other things, the events of September 11, 2001, the federal government's handling of continued threats from Al Qaeda, the war in Iraq, the hunt for Osama bin Laden and various other subjects related to national security and international relations.  The records would also reflect personal telephone calls of all sorts.

5.     Without some limitations being imposed upon the DOJ, it will obtain and review these records without having to overcome the First Amendment and common law protections that normally guard against compelled disclosure of the identities of confidential sources of news.

6.     With this action, The Times seeks the opportunity to assert its First Amendment and common law rights and to demonstrate that the telephone records of Times journalists are protected from disclosure to the DOJ.  If the DOJ is permitted to obtain and review the records without any court determining whether they are privileged, The Times and its reporters and journalists who rely, at the very least, on the opportunity to assert in a court of law their rights to protect the confidentiality of their sources, will suffer irreparable harm.

3

7.     Therefore, The Times respectfully seeks: (1) an Order declaring that Defendants may not obtain or review the telephone records of Times journalists until such time as the Court has had an opportunity to consider whether those records are protected against compelled disclosure and enjoining the DOJ from seeking such information until this Court so orders and (2) an Order declaring that the records are indeed protected from compelled disclosure under the First Amendment, federal common law and the Department of Justice Guidelines and enjoining Defendants from obtaining or reviewing them.

## JURISDICTION AND VENUE

8.     This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the United States Constitution and 28 U.S.C. § 1331.  The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

9.     Venue is proper in this district under 28 U.S.C. § 1391(e) as the United States of America and its agent, the Attorney General, are named as defendants; the plaintiff resides in this district; and a substantial part of the events giving rise to this claim occurred in this district.

## THE PARTIES

10.     Plaintiff, The New York Times Company, is a diversified media company that has long been based in New York City.  In addition to its flagship newspaper, *The*

4

*New York Times,* Plaintiff also owns the *Boston Globe,* the *International Herald Tribune* and fifteen regional newspapers as well eight television stations and WQXR Radio in New York.

11.     Defendant Attorney General John Ashcroft heads the United States Department of Justice, the agency of the United States government responsible for enforcement of federal criminal laws and domestic intelligence investigations.  Defendant Attorney General Ashcroft has ultimate authority for supervising all of the operations and functions of the Department of Justice, including the activities of its United States Attorneys.

## FACTUAL BACKGROUND

12.     In August 2002 and again nearly two years later in July 2004, The Times received letters from the United States Attorney for the Northern District of Illinois, Patrick Fitzgerald, Esq., concerning some sort of leak investigation in which he and/or others in the DOJ were engaged.  Mr. Fitzgerald requested that The Times produce Mr. Shenon and Ms. Miller for interviews and that it produce records of their telephone calls for 20 days in the weeks and months after September 11, 2001.  His letters gave no indication (and offered no evidence) that the records were critical to the maintenance of any case or investigation; nor did they articulate whether or to what extent alternative methods for uncovering the information had been pursued by the Department of Justice.  Instead, Mr. Fitzgerald insisted upon receipt of the information and threatened that if The Times did not cooperate, he would obtain telephone records of the journalists from third party telephone companies.  The Times was informed recently by a letter from Deputy Attorney General James B. Comey, dated Septem-

5

ber 23, 2004, that the Department of Justice had determined that it was "now obliged to pro-

ceed" to obtain the telephone records.

**The August 7, 2002 Letter**

13.    On August 7, 2002, The Times' General Counsel received a letter from

Mr. Fitzgerald requesting an interview with Mr. Shenon and the production of Mr. Shenon's

telephone records for 16 days, from September 24 to October 2, 2001 and December 7 to De-

cember 15, 2001.

14.    The letter stated that an interview of Mr. Shenon and the production of

his telephone records were sought in connection with an ongoing investigation into a leak by a

government employee about a planned raid on the offices of the Global Relief Foundation

("GRF"), an Islamic charity group accused of funding international terrorist operations.

15.    On information and belief, GRF's offices were raided and searched by

agents of the Federal Bureau of Investigations ("FBI") on December 14, 2001.  On informa-

tion and belief, the raid on GRF was the first of its kind under the USA PATRIOT Act, which

was signed into law after the attacks of September 11, 2001, and significantly expanded the

government's power to investigate alleged terrorist activities.  The government alleged that

GRF had engaged in the funding of terrorist activities.

16.    Upon information and belief, the December 14, 2001 raid was not un-

expected.  The Times itself had reported well prior to September 11 that Islamic-American

charities such as GRF had ties to international terrorist activities.  Moreover, on October 1,

2001 the newspaper published an article, written in part by Ms. Miller, stating that GRF was "suspected of providing money and support to [Osama bin Laden's] terrorist operations."

17.    Neither Mr. Shenon nor The Times reported on the raid until after it had occurred.

18.    Mr. Fitzgerald's August 7 letter asserted that a government employee had leaked news of the raid to Mr. Shenon prior to December 14, 2001 and that the DOJ was attempting to ascertain the identity of that employee.

**The August 13, 2002 Letter**

19.    The Times replied by letter written by George Freeman, Esq., its Assistant General Counsel, dated August 13, 2002, stating that it had considered the DOJ's request but could not comply because Mr. Shenon's newsgathering activities — and especially his conversations with confidential sources — were protected by the First Amendment, federal common law, the New York and District of Columbia Shield Laws, and the DOJ's own published guidelines.

20.    Mr. Freeman added that while The Times appreciated the DOJ's concerns over security and was proud of its own record on terror-related issues, it could not assist the DOJ by disclosing its confidential sources, especially without any showing of particularized need.

7

21.    Following the August 13 letter, The Times did not hear from the DOJ about the matter for almost two years.

**The July 12, 2004 Letter**

22.    On July 12, 2004 The Times received a second letter from U.S. Attorney Fitzgerald.

23.    The July 12 letter reiterated the request for telephone records and an interview of Mr. Shenon and expanded the request to include information relating to another Times reporter, Ms. Miller.  The letter sought an interview with Ms. Miller and her telephone records for twenty days (including all 16 days covered in the request for Mr. Shenon's records), September 24 to October 2, 2001, November 30 to December 4, 2001 and December 7 to December 15, 2001.  The letter indicated that the records were being sought in connection with some sort of investigation into an earlier alleged leak from a government employee to Ms. Miller in "late September and early October 2001."

24.    The alleged leak to Ms. Miller purportedly concerned a government decision to freeze the assets of GLF and a separate Dallas, Texas-based Islamic Charity, the Holy Land Foundation ("HLF"), which has been accused of aiding the Palestinian terrorist group, Hamas.

25.    The July 12 letter concluded by asserting that if The Times did not cooperate with the DOJ's requests, the DOJ would, "in short order," obtain and review information from telephone companies that provide service to The Times and its journalists.

**The July 21, 2004 Letter**

26.     On July 21, 2004 The Times responded again, by letter of Mr. Freeman, pointing out that the U.S. Attorney's previous two letters failed to attempt to satisfy the requirements of the Attorney General's guidelines and well-settled case law governing discovery requests to the press.  The letter expressed concern that the requested telephone records amounted to a "fishing expedition" and concluded by requesting the DOJ's cooperation in having the matter resolved, if necessary, by the courts.

27.     Specifically, the letter stated that "we would intend to seek court resolution of the issue, and ask your cooperation that you not serve subpoenas on third parties, such as phone companies, until our discussions end, and we are able to plan to properly put this before the court."

**The July 27, 2004 Letter**

28.     Mr. Fitzgerald responded to the July 21 letter with a letter dated July 27, 2004.  In that letter, Mr. Fitzgerald did not agree, per The Times's request, to cooperate on a schedule for presenting this dispute to a court of law.  Instead, Mr. Fitzgerald asserted that he would "not delay further" and "would proceed" to seek the journalists' telephone records from third party telephone companies.

**The August 4, 2004 Letter**

29.     On August 4, 2004, The Times, through its counsel, responded by letter to Hon. James B. Comey, the Deputy Attorney General, seeking a meeting to discuss the out-

standing issues raised by Mr. Fitzgerald's letters.  In that letter, a copy of which (with exhibits) is annexed to this Complaint as Exhibit A, The Times pointed out that the telephone records sought likely reflected "hundreds of communications between Mr. Shenon and Ms. Miller and their confidential sources at a time when both journalists were investigating and reporting on a vast array of vitally important and controversial matters."  Revelation of the records, the letter stated, "could likely identify the names of not one or two, but potentially dozens of confidential sources" without providing The Times with "the opportunity to persuade a court of law that the records are protected from compelled disclosure by the First Amendment . . . ."  The six-page letter concluded its plea for a meeting with Mr. Comey with the request that the Justice Department not seek the telephone records and, at the very least, that it not attempt to do so "in a way that makes it impossible for The Times and its journalists to assert their constitutional right[s]."

**The September 23, 2004 Letter**

30.     By letter dated September 23, 2004 and received by mail on September 27, 2004, Mr. Comey declined the Times's request for a meeting.  Concluding that Mr. Fitzgerald had acted properly in all respects, Mr. Comey noted his agreement with Mr. Fitzgerald's "assessment" that the documents should be obtained and used by the Department of Justice."  Not only, Mr. Comey concluded, was the Department of Justice not obliged to set forth the basis for its judgment that the records should be obtained, but it was not obliged "to afford the *New York Times* an opportunity to challenge the obtaining of telephone records prior to our review of the records, especially in investigations in which the entity whose records are

being subpoenaed chooses not to cooperate with the investigation." The Department of Justice, Mr. Comey stated, was "now obliged to proceed" to obtain the telephone records. A copy of Mr. Comey's letter it annexed to this Complaint as Exhibit B.

**The Imminent Danger Presented By The DOJ's Conduct**

31.    The Times does not know when, where or how the DOJ intends to obtain the First Amendment protected telephone records, if it has already done so and, if so, whether it has commenced its review of the records.

32.    The Times does know, however, that disclosure of the records sought would reveal the identities of potentially dozens of confidential sources who provided newsworthy information to Mr. Shenon and Ms. Miller.

33.    During the relevant 20 day period, The Times published 15 articles written by Mr. Shenon and Ms. Miller, many of which included attributions to confidential sources. Moreover, during that time period Mr. Shenon and Ms. Miller investigated and gathered information for numerous other articles that were not published until weeks later. The telephone records being sought could thus reflect hundreds of communications between Mr. Shenon and Ms. Miller and their confidential sources at a time when both journalists were investigating and reporting on a vast array of vitally important and controversial matters.

34.    Between September 24, 2001 and December 31, 2001 — a broader timeframe encompassing the relevant 20 days — Mr. Shenon and Ms. Miller wrote 78 articles

for The Times. These articles, dozens of which contain information attributed to confidential sources, are attached hereto as C.

35.     The articles attached as Exhibit C contain information from confidential sources concerning a wide range of issues including, among others:

- relations between the United States and the Saudi and Kuwaiti governments;

- continued threats from Al Qaeda;

- the hunt for Osama bin Laden;

- the government's preparedness for the attacks of September 11;

- DOJ and FBI terrorism prevention efforts post-September 11;

- the relationship between the FBI and local law enforcement;

- proposed internal reorganization of the FBI;

- Department of Homeland Security terrorism alert levels;

- the existence of weapons of mass destruction in Iraq;

- the "millennium terror plot;"

- prevention of a nationwide smallpox epidemic;

- and numerous articles regarding the spread of anthrax and the resulting government investigation.

36.     If the confidential sources whose information was printed in these articles and other future confidential sources believed that their communications with reporters from The Times could be obtained in secret by the DOJ without even an opportunity for The Times or its reporters to assert privilege, the ability of The Times and its reporters to gather

news would be severely impaired in a manner that cannot be countenanced by the First Amendment.

**Circumvention of Constitutional Law, Federal Common Law and the Attorney General's Own Guidelines**

37.    This Nation's commitment to protecting journalist's newsgathering activities is demonstrated and well-settled.

38.    The First Amendment of the United States Constitution and the reporter's privilege arising under federal common law protect against the compelled disclosure of information received by journalists in the course of their newsgathering activities and, above all, the identity of confidential sources.  These protections reflect a paramount public interest in the existence and maintenance of a vigorous, aggressive and independent press capable of furthering a robust, unfettered debate over controversial matters and are based on the firm recognition that effective newsgathering depends significantly on journalists' ability to secure the confidence and trust of their sources.

39.    The commitment to protecting journalists' newsgathering activities from disclosure is also embodied in federal statutory law and published DOJ guidelines governing subpoenas issued to the news media.

40.    The Federal Privacy Protection Act, codified at 42 U.S.C. §2000-aa, provides in relevant part that subject to certain exceptions, the government may not, without a subpoena:

search for or seize documentary materials . . . possessed by a person in connec-
tion with a purpose to disseminate to the public a newspaper, book, broadcast,
or other similar form of public communication, in or affecting interstate or for-
eign commerce.

41.    The July 1980 Senate Report accompanying the Privacy Protection Act
explicitly recognized the "unique needs of the journalism profession, and the unique role that
the press is accorded in our constitutional framework." The Report announced Congress'
commitment "to the principle that the government ought to employ the least intrusive, practi-
cable means to secure information that is necessary for criminal proceedings" and made clear
that Congress' intention in enacting the law was to ensure that members of the press have an
opportunity to appear in court before the government may obtain materials reflecting their
newsgathering process.

42.    Statements from members of Congress during debates on prior drafts of
the Privacy Protection Act also made clear that the legislation was passed to ensure that the
press had an opportunity to challenge the discovery demands of the government in court. Ad-
ditionally, these floor debates left no doubt that a strong commitment to protecting the press
prompted the legislation. Senator Robert Dole, for instance, observed: "The potentially chill-
ing repercussions of unannounced police searches of newspapers, broadcasting stations, and
other news media simply cannot be tolerated in a free society. The public's right to know can
only be protected by a free and uninhibited press. The news media must also be able to guar-
antee its sources a reasonable degree of confidentiality. Just as we must guard against unwar-
ranted invasions of personal privacy, we have a responsibility to reaffirm our commitment to
freedom of the press." Similarly, Senator John Heinz stated that "it is not necessary that ac-

14

tual abuses occur in order to silence confidential sources which are vital to the flow of information" but instead, "[t]he mere perception that such abuses might, or will, occur is sufficient to discourage those sources from coming forward to arm the press with those facts which are essential to its focus and operation."

43.      These principles also form the foundation of the Attorney General's guidelines governing subpoenas to the media, codified at 28 CFR § 50.10.  The initial version of the guidelines were issued by Attorney General John Mitchell.  In a 1970 speech to the American Bar Association, Attorney General Mitchell recognized an ongoing "bitter dispute" between the Justice Department and the media which had "produced seeds of suspicion and bad faith."  Observing that "a free press is the condition of a free society," Attorney General Mitchell promised future "good faith and common sense" in the issuance of subpoenas to the media.

44.      The guidelines begin with an observation that:

Because freedom of the press can be no broader than the freedom of reporters to investigate and report the news, the prosecutorial power of the government should not be used in such a way that it impairs a reporter's responsibility to cover as broadly as possible controversial public issues.  This policy statement is thus intended to provide protection for the news media from forms of compulsory process, whether civil or criminal, which might impair the news gathering function.

45.      The guidelines further provide that attempts by DOJ to seek materials from news media should, "in every case," carefully consider the effects such action will have on the "public's interest in the free dissemination of ideas and information."  The guidelines also instruct United States Attorneys to seek materials from news media only as a last resort,

15

to engage in negotiations with the media before formally seeking any materials, to set forth

the need for the materials with particularity, and to receive the express permission from the

Attorney General before formally seeking such materials.  The guidelines add that "except

under exigent circumstances," subpoenas to the press should "be limited to the verification of

published information and to such surrounding circumstances as relate to the accuracy of the

published information" and that "wherever possible," subpoenas should be directed at "a lim-

ited subject matter" and "should cover a reasonably limited period of time."

46.     The only significant amendment to the guidelines came in 1980, when

Attorney General Benjamin Civiletti broadened their scope to include telephone records.  The

amendment was prompted by revelations that the DOJ had subpoenaed the home telephone

records of a *Times* reporter from a telephone company and had instructed the telephone com-

pany to keep the subpoena secret for 90 days, thus ensuring — just as it seeks to do again in

this case — that there would be no timely challenge of the subpoena.

47.     Subsection (g) of the guidelines now provide, with specific regard to

requests for phone records, that:

> In requesting the Attorney General's authorization for a subpoena for the tele-
> phone toll records of members of the news media, the following principles will
> apply:
>
> > (1) There should be reasonable ground to believe that a crime has been
> > committed and that the information sought is essential to the successful
> > investigation of that crime.  The subpoena should be as narrowly drawn
> > as possible;  it should be directed at relevant information regarding a
> > limited subject matter and should cover a reasonably limited time pe-
> > riod.  In addition, prior to seeking the Attorney General's authorization,
> > the government should have pursued all reasonable alternative investi-
> > gation steps as required by paragraph (b) of this section.

16

(2) When there have been negotiations with a member of the news media whose telephone toll records are to be subpoenaed, the member shall be given reasonable and timely notice of the determination of the Attorney General to authorize the subpoena and that the government intends to issue it.

(3) When the telephone toll records of a member of the news media have been subpoenaed without the notice provided for in paragraph (e)(2) of this section, notification of the subpoena shall be given the member of the news media as soon thereafter as it is determined that such notification will no longer pose a clear and substantial threat to the integrity of the investigation. In any event, such notification shall occur within 45 days of any return made pursuant to the subpoena, except that the responsible Assistant Attorney General may authorize delay of notification for no more than an additional 45 days.

(4) Any information obtained as a result of a subpoena issued for telephone toll records shall be closely held so as to prevent disclosure of the information to unauthorized persons or for improper purposes.

48.     Like the guidelines, the United States Attorney's Manual similarly provides that:

It is the Department's policy to protect freedom of the press, the news gathering function, and news media sources. Therefore, all attorneys contemplating the issuance of such subpoenas, the interrogation of a member of the news media, or the initiation of criminal proceedings against a member of the news media should be aware of the requirements of 28 C.F.R. § 50.10.

\*                \*                \*                \*                \*

49.     The DOJ intends to bypass — and may have already begun the process of bypassing — the commands of the First Amendment, federal common law and the principles articulated under statutory law and the DOJ guidelines by demanding telephone records not from The Times but instead from third parties who likely have no interest in challenging, and will not challenge, its authority.

50.    Demanding journalists' telephone records that reveal confidential sources from third parties is tantamount to demanding the records from the journalists themselves.  A journalist's promise to maintain confidentiality would be meaningless if a source's identity could be discovered without any legal challenge.

51.    Therefore, the DOJ should be — and to ensure a vigorous, aggressive and independent press, must be — required to articulate in a court of law the reasons that the telephone records it seeks are so critical to its apparent investigations that its discovery demands should prevail over the Nation's longstanding commitment to protecting the independence and vitality of the press.

## COUNT I

### The Times Must Be Provided With The Opportunity To Be Heard To Assert Its Constitutional Rights

52.    Plaintiff realleges and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

53.    Defendants intend to obtain and review the telephone records through demands to third-parties and without any notice to The Times, essentially guaranteeing that there will be no challenge to the production of the records and effectively circumventing the commands of the First Amendment, the Due Process Clause of the Fifth Amendment and federal common law.

54.    Defendants' efforts to obtain and review the telephone records without affording The Times an opportunity to be heard before a court of law, violates The Times's rights under the First and Fifth Amendments of the United States Constitution.

## COUNT II

### The Telephone Records of The Times Are Protected By
### The First Amendment

55.    Plaintiff realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

56.    The telephone records sought by Defendants contain information sufficient to reveal the identities of numerous confidential sources of Mr. Shenon and Ms. Miller. The telephone records are protected from disclosure by the First Amendment of the United States Constitution.

## COUNT III

### The Telephone Records Of The Times Are Protected By
### Federal Common Law

57.    Plaintiff realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

58.    The telephone records sought by Defendants contain information sufficient to reveal the identities of numerous confidential sources of Mr. Shenon and Ms. Miller. The telephone records are protected from disclosure by the reporter's privilege under federal common law.

## COUNT IV

### The Department of Justice Has Not Complied With Its Own Guidelines Governing Subpoenas To The Media

59.     Plaintiff realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

60.     The telephone records sought by Defendants contain information sufficient to reveal the identities of numerous confidential sources of Mr. Shenon and Ms. Miller. The DOJ has not complied with its own guidelines governing subpoenas to the media, codified at 28 CFR § 50.10, and thus may not seek and obtain the telephone records.

## PRAYER FOR RELIEF

Wherefore, plaintiff prays for the following relief:

(1)     An Order declaring that Defendants may not obtain or review the telephone records of its journalists until such time as the Court has had an opportunity to consider whether those records are protected against compelled disclosure and enjoining the DOJ from seeking such information until this Court so orders; and

(2)     An Order declaring that the records are indeed protected from compelled disclosure under the First Amendment to the United States Constitution, federal common law and 28 CFR § 50.10 and enjoining Defendants from obtaining or reviewing them.

Dated: New York, New York
September 28, 2004

CAHILL GORDON & REINDEL LLP

By: _____
    Floyd Abrams (FA-0902)
    Susan Buckley (SB-4668)
80 Pine Street
New York, New York  10005
(212) 701-3000

Attorneys for Plaintiff

21